**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Reza Yazdian, | ) |
| | ) |
| Plaintiff, | ) Case No. 1:12-CV-951 |
| | ) |
| vs. | ) |
| | ) |
| ConMed Endoscopic | ) |
| Technologies, Inc., | ) |
| | ) |
| Defendant. | ) |

**O R D E R**

 This matter is before the Court on Defendant ConMed Endoscopic Technologies, Inc.'s motion for summary judgment (Doc. No. 28). For the reasons that follow, Defendant's motion for summary judgment is well-taken and is **GRANTED.**

I. Background

 Plaintiff Reza Yazdian presents claims against Defendant ConMed Endoscopic Technologies, Inc. ("ConMed") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., relating to the termination of his employment in July 2010. Specifically, Plaintiff alleges that ConMed terminated his employment because of his Iranian national origin and Muslim religion and in retaliation for having lodged complaints about discrimination. Plaintiff also asserts a state law claim for unjust enrichment under Ohio law which alleges that ConMed has refused to pay him sales commissions he is entitled to receive. Because no reasonable juror could find that ConMed terminated Plaintiff because of his national origin and/or religion, or that ConMed retaliated against him, ConMed is entitled to summary judgment on Plaintiff's Title VII claims. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148

(2000). Additionally, because the record indisputably establishes that ConMed paid Plaintiff all of the sales commissions due him, ConMed is entitled to summary judgment on Plaintiff's unjust enrichment claim.

A. <u>Facts Relevant to Plaintiff's Title VII Claims</u>

ConMed develops and sells medical devices and equipment, including endoscopic products. As mentioned above, Plaintiff is of Iranian ethnic origin and is a non-practicing Muslim. Plaint. Dep. (Doc. No. 37), at 87. Plaintiff began working for ConMed in 2005 as a territory manager, i.e., sales representative, for the region encompassing Cincinnati. Plaintiff was regarded as a capable salesman who consistently met or exceeded his sales goals. According to ConMed, however, Plaintiff was difficult to manage - a failing which ultimately led to his termination.

Plaintiff's difficulties at ConMed began in late 2008 when Tim Sweatt became the district sales manager for Plaintiff's territory. According to Sweatt, Plaintiff's performance problems centered around his internal communications skills. Sweatt found that Plaintiff's communications with him and other ConMed employees were overly-negative and could be rude and disrespectful. Additionally, Plaintiff had a habit of leaving Sweatt repetitive and overly-long voice mails. Sweatt documented some of these issues in March 2009 in the first and only annual performance review he completed regarding Plaintiff. While overall this review was very positive, Sweatt noted that Plaintiff "should work to improve internal communications with Product Managers when making requests (tone can sometimes be overly demanding)." Sweatt Dep. Ex. 8, at RY000958. Sweatt also commented that "when frustrated his [Plaintiff's] internal communications can be taken as overly negative on occasion[.]" <u>Id.</u>

2

In April 2009, Sweatt sent Plaintiff a lengthy email in which he outlined continuing problems with Plaintiff's internal communications. Sweatt Dep. Ex. 10. Specifically, Sweatt noted that Plaintiff's response to a congratulatory message Sweatt sent him "was extremely negative, defensive . . . and could be taken as insubordinate." Id.[1] Sweatt also commented on a recent conference call he had had with Plaintiff in which he reminded Plaintiff of the need to pay attention to the frequency, tone and length of his internal communications. Id. Sweatt noted, however, that only a few days after that phone conference, Plaintiff had left him two lengthy, repetitive voice mails that were "very negative" towards the company and the marketing team. Id. Sweatt also noted that he observed Plaintiff making negative comments about the company to another sales representative later the same week. Id. Sweatt cautioned Plaintiff that "[t]oo often your messages are negative, self-centered and redundant" and that "[w]ithout immediate correction, this behavior will affect that Southeast district for which I am responsible." Id. Sweatt told Plaintiff that he needs to be "positive and constructive with the other [territory managers] and to "extend me the business courtesy I am due as your business manager." Id. Sweatt also told Plaintiff that he was willing to help him develop with his communications issues if he committed to improve. Id. Dennis Werger, Sweatt's immediate supervisor at the time, emailed Plaintiff that Sweatt's observations were "very constructive, positive and accurate." Additionally, Werger offered to help

---

[1] Sweatt's initial email to Plaintiff is not in the record, but Plaintiff's response to that email is. Plaintiff Dep. Ex. 9. Sweatt's characterization of Plaintiff's email as borderline insubordinate is accurate. Plaintiff indicated in this email that he did not need or want any coaching or sales advice from Sweatt: "Thanks again for the advice but I think it would be best served for you and me that I get answers to the questions I have raised to marketing on numerous occasion." Id.

Plaintiff improve his communications skills so that his messages did not read so negatively. Plaint. Dep. Ex. 10.

The following day, Sweatt sent Plaintiff an email complimenting him on positive and constructive comments he made during a team conference call. Sweatt Dep. Ex. 9. Sweatt testified that he sent Plaintiff this email in order to reinforce Plaintiff's positive behavior. Sweatt Dep. at 141-43.

Plaintiff consistently expressed interest in promotional opportunities to Sweatt and others at ConMed. Sweatt Dep. at 127. Sweatt, however, informed Plaintiff that his communications style was holding him back. Sweatt Dep. at 127. In a January 2010 email from Sweatt to Scott Jackson, who became Sweatt's supervisor in June 2009, and Mark Donovan, ConMed's Vice President of Global Marketing, Sweatt provided an update on Plaintiff's communications problems:

> I have explained to Reza that what is going to hold him back from career advancement is communication, and that performing as a Trainer is not going to help him in this area. His needs are to better improve his listening and communications skills, learn to accept the word "no" as something other than a personal attack, avoid run-on voice mails that repeat themselves, and recognize that communication should be conversational rather than confrontational, i.e., you can win an argument and still lose.

Sweatt Dep. Ex. 18.

Jackson recalled in his deposition that Plaintiff did not react appropriately when he told Plaintiff that he did not think that he would be a good candidate for a district manager position. Jackson testified that Plaintiff became defiant and disrespectful and questioned his ability to judge Plaintiff's qualifications. Jackson Dep. (Doc. No. 42) at 78-82.

4

In a journal he kept of weekly calls with his territory managers, Sweatt documented several other occasions when Plaintiff treated him rudely or disrespectfully.[2]

Plaintiff's problems with appropriate internal communications seem to have come to a head in April 2010.  Plaintiff had closed a rather large sale and submitted an article he had written touting his achievement to the editor of ConMed's monthly sales newsletter, Christine Pandolf.  According to Pandolf, Plaintiff called her at least twenty times to ask whether she was going to publish his article unedited.  Pandolf Dep. at 31-33.  Pandolf told Plaintiff that she could not publish the article for two reasons -  one, it was too long, and two, she needed to validate the information in it with his manager. Id. at 31-33.  Pandolf testified that Plaintiff "was not happy" when she gave him this information.  Pandolf then apparently forwarded Plaintiff's article to Sweatt for review. Id.

Sweatt told Plaintiff that he would not submit his article for publication.  Sweatt informed Plaintiff that it was the sales manager's prerogative to submit articles

---

[2]     Doc. No. 55-1, at 7 (December 7, 2009) (Sweatt noted that Plaintiff called him "Mr. Sweatt" a number of times in a derogatory and insulting manner and commented that "his attitude towards me was extremely negative and Reza continues to display an attitude that he is owed something."); id. at 8 (December 21, 2009) ("Thinks I [Sweatt] have an inferiority complex."); id. at 34 (June 1, 2010) ("Hostile work environment (you are creating)"; "You are the worst manager I've ever had"; "Say anything you want to say – in writing."; "You have no idea how many emails I field to [sic] other TMS about your mgmt style."; "You haven't backed me on anything."; "Any major details you send to me in writing."; "You don't show me anything longevity or respect."; "I'm in the driver's seat, don't think you are."; "You are out of line."). id. at 35 (June 7, 2010) ("I [Sweatt] just go and bullshit from one place to another."); id. at 44 ("I don't need a compliment from you.").
.

5

concerning sales achievements to the newsletter and that he would write an article that reflected positively on Plaintiff's accomplishment. Sweatt Dep. at 200-01. Sweatt testified that Plaintiff "didn't care for that, and after that, he began to get loud and shout at me on the phone." Id. When Plaintiff asked what was wrong with his article, Sweatt told him it was too self-centered and did not present him in the best light to the company. Id. Sweatt said that Plaintiff grew even louder and more abusive and said to Sweatt, "You don't like the way I write. You don't like the way I talk. I guess you don't like my race, either." Id.[3] Sweatt testified that he told Plaintiff that his race had nothing to do with their conversation but that Plaintiff continued to shout and grew more belligerent. After trying to end the conversation three times, Sweatt eventually just hung up the phone. Id. at 201-02.

On June 25, 2010, Sweatt drafted an email to Karen Hutto, Vice President of the Human Resources Department, which outlined these and other examples of Plaintiff's unprofessional behavior and requested assistance as to the best way to proceed with corrective action. Doc. No. 44-6. Hutto directed Deborah Hebbard to draft a warning letter to Plaintiff based on Sweatt's email. Hebbard Dep. (Doc. No. 32) at 39-41.

On or about July 10, 2010, Sweatt phoned Plaintiff to let him know that he would be receiving a warning letter concerning his unprofessional behavior. According to Sweatt, this phone call prompted another lengthy and unprofessional outburst from

---

[3]    Sweatt also documented that Plaintiff said to him: "You can't beat me in a debate."; "Let's get the dean of my law school on the phone."; "I took on the Cincinnati bar association and won."; "My writing is excellent." Doc. No. 44-6. Sweatt also noted that Plaintiff ended the phone call by shouting at him, "This conversation is not over!" Id.

Plaintiff. In fact, Sweatt testified, it was Plaintiff's response to this phone call which convinced him that Plaintiff would not change his behavior and that termination of his employment was required. Sweatt Dep. at 193-96.[4] In his deposition, Plaintiff admitted,

---

[4]     Sweatt's journal notes that Plaintiff made the following statements during this call:

"I'm going to put you on warning."
"I'm going to win – 'cause I always do."
"I'm going to respond w/counsel."
"I'm going to bring you up on charges before. . ."
"Put it in writing."
"Issuing letters from physicians."
"3 weeks before my wedding"
"Bring a lawsuit against me [Sweatt]."
"You are out of line – from day one."
"Don't call me anymore."
"Hostile work environment."
"Go to every employee."
"I will win. I always win."
"Bad individual."
"At my level you question my authority."
"3 weeks prior to my wedding."
"You don't intimidate me."
"I'll call Joe [Corasanti] directly."
"You are challenging my character."
"You initiated a war with me – I have been waiting for you to do – I will take it before the board."
"I've taken on Federal Judges – I will have an attorney respond."
"I have asked the company to put me on another team."
"You make poor decisions."
"Don't control my first amendment right."
"I do not trust you."
"I want a paper trail with you."
"You make inappropriate business decisions."
"You are not in a position to challenge me."
"I don't think you are a gentleman."
"I know people respect me more than they respect you."
"I will be responding with charges."

Doc. No. 55-1, at 45-46.

and in fact never denied, making many of the insubordinate comments attributed to him by Sweatt.  Plaint. Dep. (Doc. No. 41), at 288-93.[5]

The warning letter, with an attachment describing specific incidents, identified six areas of unacceptable conduct by Plaintiff: "inappropriate outbursts, combativeness toward your manager, indifference/rudeness directed toward your manager and management, threatening tone, creating discord within the sales team, unwillingness to accept and apply constructive coaching."  Doc. No. 44-7.  Plaintiff refused to sign the warning letter but requested and received time to provide a detailed rebuttal to the allegations in the warning letter.

Also in response to receiving the warning letter, Plaintiff indicated to Sweatt, and later to Hebbard, that he intended to solicit letters of reference from ConMed's customers and from other ConMed employees.  Hebbard Dep. at 90; Doc. No. 55-1, at 45.  Hebbard advised Plaintiff that disparaging ConMed or its managers to customers would be grounds for termination.  Hebbard Dep. at 90.  Plaintiff claims, however, that Hebbard warned him that he would be terminated if he complained about Sweatt or other managers in his written rebuttal.  Plaint. Dep. at 298.  Plaintiff, however, admitted that he told Sweatt that he planned to request reference letters from his customers.  Id. at 293.

_____

[5]	Plaintiff testified that he "did not recall" making many of the statements documented by Sweatt.  The fact, however, that Plaintiff does not recall making some of these statements does not create a triable issue of fact as to whether he actually made the statements.  Vollrath v. Georgia Pac. Corp., 899 F.2d 533, 536 (6th Cir. 1990); Pratt v. Brown Mach. Co., 855 F.2d 1225, 1233 (6th Cir. 1988).

In the meantime, Hutto decided that Plaintiff's allegation that Sweatt "did not like his race," which Sweatt included in his initial email to Hutto, required further investigation. Hebbard Dep. at 97-98. Hutto directed Hebbard to contact Plaintiff about this allegation. According to Hebbard, when she called Plaintiff about his apparent complaint that Sweatt was discriminating against him, he stated that he could not recall making this comment, did not want to talk about it and seemed incredulous that she was even calling to ask him about it. Hebbard Dep. at 99-102.

Plaintiff submitted a detailed rebuttal to the allegations in Sweatt's warning letter, but did not include in it any complaints of discrimination. While Plaintiff provided explanations or justifications for the behavior Sweatt cited in the warning letter, for the most part he did not specifically deny that he had in fact directed rude and disrespectful comments toward Sweatt. Rather, Plaintiff generally stated that he could not recall engaging such behavior. Apparently, however, no one read Plaintiff's rebuttal paper.

It is not clear from the record at what point after Sweatt issued the warning letter that ConMed decided to terminate Plaintiff's employment. As already indicated, however, Sweatt considered Plaintiff's inappropriate verbal response to the warning letter as the precipitating factor that led to his recommendation that Plaintiff's employment be terminated. Sweatt Dep. at 193-96. ConMed officially terminated Plaintiff on July 26, 2010.

Despite documented issues concerning the tone and content of his communications with Sweatt and other employees of ConMed, Plaintiff attempts to spin a series of mainly trivial incidents into evidence of ethnic and religious animus on Sweatt's part. Plaintiff notes the following occurrences:

9

- Sweatt sent Plaintiff a copy of National Geographic article about ancient Persia that Sweatt thought Plaintiff might enjoy reading.

- One year at Christmastime, Sweatt gave each of his other territory managers, including Plaintiff, a $50 Honey Baked Ham gift certificate. Sweatt wrote an email to Plaintiff that said "You should be getting a delivery at your storage unit from me today.  Although I believe you have said you do eat pork, I would like to mention that if you have never shopped at this place before, they have many other items - the turkey is quite good!"

- Sweat refused to excuse Plaintiff from ConMed's national sales meeting that took place two weeks after his mother's death.

- Sweatt pressured Plaintiff to socialize at the convention.

- Sweatt threatened to make Plaintiff travel - again a few weeks after his mother's death - to address issues with a product ConMed was trying to sell to a customer.

- Sweatt interfered and almost jeopardized a sale Plaintiff was helping another territory manager close.

- Sweatt removed Plaintiff from a special projects role, reduced the time Plaintiff could spend in the field with other territory managers, and allowed a non-Muslim, non-Iranian representative to make sales calls instead of him.

- Plaintiff was not paid some sales commissions in either the third or fourth quarter of 2009 until he complained.

- During a ride-along in January 2010, Plaintiff claims that Sweatt told him that his clothes made him look like a "fag."

- Several days before the 2010 national sales meeting, Sweatt informed another territory manager, John Kruse, that neither he nor Plaintiff would be receiving an award.  Sweatt asked Kruse not to tell Plaintiff and did not inform Plaintiff that he would not be receiving an award until an hour before the awards dinner.

- At the same sales meeting, Plaintiff had an individual meeting with Sweatt, Jackson and Donovan to discuss promotional opportunities which had to be cut short because Plaintiff had to catch a flight.  During the meeting, Sweatt told Plaintiff that he would not be a great person to be in charge of the compensation plan for the company.

10

- Sweatt and Jackson did not encourage Plaintiff to apply for a field trainer position although they did encourage two non-Muslim, non-Iranian employees to apply.

### B. Facts Relevant to Plaintiff's Unjust Enrichment Claim

ConMed set out the commission schedule for its territory managers in the 2010 Territory Manager Commission/Incentive Plan, which Plaintiff acknowledged he received and agreed to follow.  Plaint. Dep. Ex. 14; Plaint. Dep. at 129-30.  As is relevant here, the commission plan provides that "Commissions are paid on shipped product, as of month-end.  Backordered sales and sales on 'credit hold' are not commissionable sales."  Id. at 3.  Additionally, "Territory Managers who terminate will be paid a pro rata share of the termination month's commission amount for the Territory based on the number of actual working days prior to the termination."  Id. at 4. According to these two provisions, therefore, a territory manager: 1) is not entitled to a commission until ConMed actually ships the product to the customer;  and 2) is only entitled to a pro rata share of the commission based on the days he worked if he terminates employment before the end of the month.  Therefore, in this case, under the terms of the commission plan, Plaintiff was only entitled to receive commissions on products that actually were shipped before his termination, and even then, his commission would have been pro rated to the date of this termination.

Plaintiff seemed to agree with this interpretation of the commission plan in his deposition.  Plaint. Dep. 136-38.  In his deposition, however, Plaintiff had a difficult time articulating a specific sale of a product on which he allegedly is entitled to receive a commission.  Reading his deposition, the gravamen of Plaintiff's complaint appears to be that had ConMed not allegedly discriminated and retaliated against him, he would

11

have continued to earn commissions on future sales, as opposed to a contention that ConMed failed to pay him commissions on sales he had already completed.  Plaint. Dep. at 138-45.  In other words, Plaintiff's complaint concerning alleged unpaid commissions would more appropriately appear to be an element of compensatory damages for alleged discrimination and retaliation rather than a stand-alone claim for unpaid commissions.

Plaintiff's memorandum in opposition to ConMed's motion for summary judgment does not identify any commissions he thinks he is entitled to receive.  Instead, he argues only that the compensation plan is illusory because it did not obligate ConMed to pay commissions to territory managers and, therefore, the existence of this agreement does not preclude his unjust enrichment claim.  ConMed, on the other hand, supplied documentation showing that Plaintiff's commissions for July 2010 were prorated and paid out based on his termination date of July 26.  Doc. No. 43-2.

C. <u>Procedural History</u>

Plaintiff filed an complaint with the EEOC alleging national origin and religious discrimination, and retaliation, in February 2011 and received a right-to-sue letter in September 2012.  Plaintiff then filed a timely complaint with this Court asserting his Title VII discrimination and retaliation claims.[6]  In October 2013, Plaintiff filed an amended complaint which added his unjust enrichment claim.

---

[6]     In addition to his disparate treatment and retaliation claims, Plaintiff originally alleged that ConMed subjected him to a discriminatorily hostile work environment.  Plaintiff, however, has now abandoned that claim.  <u>See</u> Doc. No. 43, at 10 n.1.

Following the close of discovery, ConMed filed the instant motion for summary judgment which is now ready for disposition.

## II. Summary Judgment Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

13

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

### III. Analysis

#### A. Title VII Discrimination and Retaliation

##### 1. Disparate Treatment

Plaintiff contends that ConMed was motivated by his ethnic origin and religion when it terminated his employment. ConMed asserts that it discharged Plaintiff because of his unprofessional demeanor and inability to accept coaching and constructive criticism and that Plaintiff's protected characteristics had nothing to do with its decision.

A Title VII plaintiff can establish a discrimination claim through direct or circumstantial evidence. "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003). Plaintiff has not adduced any direct evidence that his termination was motivated by his ethnic origin or religion, nor in fact does he contend that there is direct evidence of discrimination.

14

Plaintiff's claim, therefore, must be analyzed through the <u>McDonnell Douglas</u> burden-shifting framework for establishing a circumstantial case of discrimination.

A plaintiff can establish a prima facie case of disparate treatment discrimination circumstantially by adducing sufficient evidence on the following elements:  1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class.  <u>Griffin v. Finkbeiner</u>, 689 F.3d 584, 592 (6th Cir. Cir. 2012).  A plaintiff may also satisfy the fourth element by showing that the employer treated similarly-situated non-protected persons more favorably than the plaintiff.  <u>Talley v. Bravo Pitino Restaurant, Ltd.</u>, 61 F.3d 1241, 1246 (6th Cir. 1995).

Once the plaintiff establishes a prima facie case of race discrimination, the burden of production shifts to the employer to proffer a legitimate, non-discriminatory reason for its decision.  <u>Manzer v. Diamond Shamrock Chem. Co.</u>, 29 F.3d 1078, 1082 (6th Cir. 1994).  If the employer meets its burden of production, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are pretextual.  <u>Id.</u>

The plaintiff may prove pretext in three ways:  1) by showing that the defendant's reasons had no basis in fact; 2) by showing that the reasons did not actually motivate the defendant; or, 3) by showing that the proffered reasons were not sufficient to warrant the action taken.  <u>Kline v. Tennessee Valley Auth.</u>, 128 F.3d 337, 346 (6th Cir. 1997).

The burden of persuasion remains with the plaintiff at all times.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 511 (1993).  In the end, in order to prevail on his discrimination claim, a Title VII plaintiff must prove that his protected characteristic was

15

a motivating factor in the employer's adverse employment action. University of Tex. Sw. Med. Center v. Nassar, 133 S. Ct. 2517, 2522-23 (2013).

Although the parties dispute whether Plaintiff can establish a prima facie case of discrimination, the Court will assume for purposes of the motion for summary judgment that he can. ConMed has clearly adduced a legitimate, non-discriminatory reason for discharging Plaintiff - his unprofessional demeanor and inability to accept coaching and constructive criticism from his supervisor.

Accordingly, Plaintiff has the burden of showing a triable issue of fact as to whether ConMed's reason for terminating him is a pretext for unlawful discrimination. He has not done so in this case. Indeed, other than Plaintiff's identification of trivial workplace incidents and his unreasonable attempt to twist what clearly were intended to be goodwill gestures by Sweatt (i.e., the Honeybaked Ham gift certificate and the National Geographic article)[7] into bigotry, there is absolutely no evidence in this record that Plaintiff's religion and national origin had anything to do with Sweatt's treatment of Plaintiff or with ConMed's decision to terminate him. Although this is no longer a hostile environment case, it is relevant to note that trivial incidents, slights, normal workplace friction, and occasional inappropriate comments are insufficient to make a work environment hostile. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Plaintiff's allegations of discriminatory treatment by Sweatt fall squarely within this rubric. In other words,

---

[7] In fact, Plaintiff admitted that he used the gift certificate, Plaint. Dep. (Doc. No. 41) at 229, 235, and he indicated that he does not abide by any dietary guidelines based on his religion. Plaint. Dep. (Doc. No. 37), at 201.

these incidents, even considered collectively, are not evidence of discriminatory animus on Sweatt's part.

As ConMed accurately argues, under Sweatt's supervision, Plaintiff had a long-standing problem with the tone of his internal communications and engaging in inappropriate and disrespectful behavior toward Sweatt and others.  Plaintiff's comments, which are set out in footnotes throughout this order, and which for the most Plaintiff either admits making or has not disputed making, are objectively rude, inappropriate, and unprofessional.

Plaintiff first contends that ConMed's reason for terminating him is pretextual because ConMed's witnesses gave contradictory or inconsistent explanations for his termination.  Shifting explanations by the employer can be evidence of pretext, Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir. 2002), but here Plaintiff has not cited any evidence showing that over time ConMed changed its reason for deciding to terminate him.  Plaintiff, rather, has cited evidence that witnesses could not pinpoint or agree on the exact moment the decision to terminate him was made.  But this is not evidence of a shifting rationale, particularly when the principle decision-makers, Sweatt and Jackson, have consistently testified that Plaintiff's disrespectful, insubordinate and unprofessional behavior was the reason for his termination.  Sweatt's testimony is also consistent with the affidavit he filed with the EEOC explaining the reasons for Plaintiff's termination.  Doc. No. 46-13.

Plaintiff argues that he has shown pretext because no one at ConMed read his rebuttal letter and because ConMed failed to seriously investigate his complaints of discrimination.  The first argument is unpersuasive and the second argument is not

17

supported by the record.  As the Court discussed earlier, Plaintiff's rebuttal letter attempts to explain and justify his behavior, but for the most part he never denied making disrespectful and insubordinate comments to Sweatt or displaying an insubordinate attitude toward Sweatt.  It is doubtful that anything Plaintiff said in his rebuttal would have changed the decision to terminate him.  As to the second argument, the record shows that ConMed tried to investigate Plaintiff's discrimination claim and he refused to cooperate with the investigation.  These arguments fail to demonstrate pretext.

Plaintiff next contends that ConMed's explanation for terminating him is untrue because he was never warned that his behavior was a problem until after he complained about being discriminated against.  This contention is just untrue.  As described earlier, in April 2009, Sweatt sent Plaintiff a lengthy email outlining the problems he was demonstrating with his internal communications.  Dennis Werger sent Plaintiff an email that concurred with Sweatt's critiques.  Additionally, Sweatt commented on Plaintiff's communications issues in the only performance review he completed for Plaintiff.  Sweatt and Jackson both testified that they verbally counseled Plaintiff about his communications and displaying inappropriate behaviors.  In short, Plaintiff was well-aware of the criticisms of his behavior long before he first complained about being discriminated against.

Plaintiff next argues that ConMed's reason for terminating him is pretextual because nothing happened between July 13, 2010, when Sweatt issued the warning letter, and July 26, 2010, when ConMed actually terminated him.  According to Plaintiff, the absence of an event that precipitated his termination shows that ConMed terminated

18

him for impermissible reasons.  As ConMed correctly argues, however, there *was* a precipitating event between July 13 and July 26 - Plaintiff's unprofessional outburst when Sweatt notified him that he would be receiving a warning letter.  Sweatt testified that it was Plaintiff's response to being informed of the warning letter that convinced him that Plaintiff should be fired.  Sweatt Dep. at 193-96.

Plaintiff also observes that Sweatt noted in his journal that he sounded contrite a few days after receiving the warning letter.  According to Plaintiff, this indicates that ConMed's reasons for terminating him are pretextual because it contradicts Sweatt's belief that Plaintiff was unwilling to change his behavior.  The fact, however, that Plaintiff was contrite later does not unring the bell of his unprofessional outburst.  Nor does the fact that later Plaintiff apparently sounded contrite necessarily indicate a commitment on his part to change his behavior.  Sweatt, in fact, evidently was not impressed by Plaintiff's apparent contrition because he noted in his journal that Plaintiff thought the warning letter was part of the "give and take" of rehabilitation.  Doc. No. 55-1, at 46.  In other words, Sweatt apparently believed that Plaintiff thought there was room for negotiation concerning the need for him to reform his behavior and, therefore, was not fully committed to change.

Finally, Plaintiff argues that Sweatt's reason for terminating him has no basis in fact because out of thirty or so interactions with him that Sweatt documented in his journal, only five of them contained negative information about him.  This argument fails to prove pretext.  Indeed, the fact that Sweatt documented negative interactions with Plaintiff at all indicates that ConMed's justification for terminating him *does* have a basis in fact.  Moreover, one might reasonably ask, how many times should Plaintiff been

19

allowed to be disrespectful and insubordinate to Sweatt before ConMed terminated him?  Five out of thirty is not a particularly good batting average where insubordination is concerned.  And, as discussed above, Plaintiff admitted in his deposition to making several insubordinate comments to Sweatt, and even his rebuttal document does not specifically deny the insubordinate comments Sweatt attributed to him in the warning letter.  This evidence also demonstrates that ConMed's reason for terminating him has a basis in fact.

On this record, no reasonable juror could find that Plaintiff's national origin or religion was a motivating factor in ConMed's decision to terminate him.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).  Accordingly, ConMed is entitled to summary judgment on Plaintiff's national origin and religious discrimination claims.

## 2. Retaliation

Like a disparate treatment claim, a plaintiff can establish a retaliation claim through direct or circumstantial evidence.  Despite his contention to the contrary, however, Plaintiff has not adduced direct evidence that his opposition to an unlawful employment practice was the reason for his termination.  Plaintiff contends that there is direct evidence of retaliation because Sweatt cited the July 13 phone call as the reason he recommended Plaintiff's termination.  As indicated in footnote 4 above, among other things, Plaintiff told Sweat that he "was going to respond with counsel" and that he "was going to file a lawsuit" against Sweatt.

As ConMed correctly argues, however, these vague statements are insufficient to constitute protected activity for purposes of a retaliation claim.  Fox v. Eagle Dist. Co.,

20

Inc., 510 F.3d 587, 591 (6th Cir. 2007) (holding that plaintiff was not opposing an unlawful employment practice when he stated only that he intended to file a lawsuit against his employer and did not mention age discrimination as the basis for the suit). Plaintiff's statements that he was going to respond with counsel and sue Sweatt are not connected to his opposition to an alleged unlawful employment practice.  See id. ("[A] plaintiff's expression of opposition must concern a violation of the [Act]").  Therefore, these statements do not constitute protected activity for purposes of a retaliation claim.

In the phone call, Plaintiff did accuse Sweatt of creating a hostile work environment, but as ConMed points out, Sweatt testified that it was not the content of Plaintiff's statements that led to his recommendation to terminate Plaintiff but rather the "belligerent and hateful" manner in which he responded to the notice of the warning letter.  Sweatt Dep. at 194-96.  In the context of Plaintiff's outburst, this statement cannot reasonably be considered good faith opposition to an unlawful employment practice.  See, e.g., Nassar, 133 S. Ct. at 2531-32 (noting that an employee who knows he is about to suffer an adverse employment action might be tempted to make an unfounded charge of racial, sexual, or religious discrimination in order to forestall lawful action).  In other words, Sweatt's citation of Plaintiff's conduct during the July 13 phone call as the reason for his termination does not constitute direct evidence of retaliation.

In the absence of direct evidence of retaliation, in order to establish a prima facie case of retaliation, a plaintiff must establish that: 1) he engaged in activity protected by the discrimination statutes; 2) the exercise of his civil rights was known to the defendant; 3) thereafter, the defendant took an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the

21

adverse employment action.  See Harrison v. Metropolitan Gov't of Nashville, 80 F.3d 1107, 1118 (6th Cir. 1996), overruled on other grounds as recognized by Jackson v. Quanex Corp., 191 F.3d 647, 667 (6th Cir. 1999).  To establish the causal connection required in the fourth prong, the plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not participated in protected activity.  See EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997); Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 377 (6th Cir. 1984).  The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.  See Avery Dennison, 104 F.3d at 861.

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate, non-retaliatory reason for the adverse employment action.  Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1082 (6th Cir. 1994).  If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are but a pretext for retaliation.  Id.

The burden of persuasion remains with the plaintiff at all times.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  In contrast to a Title VII discrimination claim, however, a plaintiff asserting a Title VII retaliation claim must prove that his protected activity was the "but for" cause of the adverse employment action.  Nassar, 133 S. Ct. at 2533.  In other words, the plaintiff must prove that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id.

In this case, the parties dispute whether Plaintiff engaged in any protected activity prior to his termination.  ConMed contends that Plaintiff had only made vague

22

complaints of discrimination, which are insufficient to constitute protected activity for purposes of a retaliation claim.  Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989).  Plaintiff disputes that his complaints of discrimination were vague but he does appear to concede that he never complained that Sweatt was subjecting him to a hostile work environment prior to June 1, 2010, when he specifically voiced that complaint to Scott Jackson and asked for a transfer to work for another district manager.  The Court need not decide whether Plaintiff engaged in protected activity, however, because a reasonable juror could not find a causal connection between his complaints and the decision to terminate his employment.  Alternatively, a juror could not reasonably find that ConMed's asserted reason for terminating Plaintiff is pretextual and/or that Plaintiff would not have been fired but for the protected activity.

Despite a fairly close temporal proximity between Plaintiff's protected activity and his termination, as discussed above, Plaintiff's difficulties with communicating appropriately with Sweatt and others predated his protected activity.  Plaintiff in fact does not dispute many of the objectively rude, disrespectful and insubordinate comments he made to Sweatt when Sweatt informed him that he was going to issue a warning letter.  Where the plaintiff's inappropriate behavior is longstanding and forms the basis for the adverse employment action, finding a causal connection between the adverse employment action and the protected activity is not reasonable.  See, e.g., Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 403 (6th Cir. 2010)(holding that plaintiff failed to establish causal connection where he conceded "all the critical facts that show the Defendants had valid, non-retaliatory justifications for the discipline that they imposed on him"); Williams v. Zurz, 503 Fed. Appx. 367, 373 (6th Cir. 2012)

23

(plaintiff failed to establish causal connection as a matter of law despite close temporal proximity where concerns about her computer misuse predated the protected activity).

The evidence on which Plaintiff relies to establish pretext on his retaliation claim is essentially the same as his discrimination claim, and, consequently fails to create triable issues of fact for the reasons already outlined by the Court.  Finally, the record firmly establishes that ConMed would have fired Plaintiff even if he had not engaged in protected activity.  As already discussed, Plaintiff had a longstanding problem with the content and tone of his communications and had often acted disrespectfully and insubordinately toward Sweatt and others.  Plaintiff failed to  correct his inappropriate behavior and it is clear that this failure is what caused ConMed to terminate him.

Accordingly, ConMed is entitled to summary judgment on Plaintiff's retaliation claim.

### 3. Unjust Enrichment

Plaintiff asserts a state law unjust enrichment claim to recover unpaid sales commissions ConMed allegedly owes to him.  Unjust enrichment occurs when the defendant retains money which in justice and equity belongs to the plaintiff.  Dixon v. Smith, 695 N.E.2d 284, 289 (Ohio Ct. App. 1997).  Conmed argues that Plaintiff cannot assert an unjust enrichment claim because there was a written agreement between the parties that established Plaintiff's right to be paid commissions.  Under Ohio law, a plaintiff cannot assert an unjust enrichment claim when a written agreement between the parties covers the same subject matter.  HAD Enter. v. Galloway, 948 N.E.2d 473, 478 (Ohio Ct. App. 2011).  In any event, ConMed argues, it is entitled to summary

judgment on this claim because it has already paid Plaintiff all of the commissions he was entitled to receive.

Plaintiff appears to concede that a written agreement controls whether he is entitled to receive sales commissions from ConMed.  Plaintiff argues, however, that the commissions plan is illusory, and therefore not enforceable, because it did not obligate ConMed to pay him commissions.  Plaintiff continues that because the commissions plan is illusory he is entitled to assert an unjust enrichment claim for unpaid commissions.  Plaintiff, however, has not rebutted ConMed's demonstration that it paid him all the commissions he was due under the terms of the plan.

Plaintiff is correct that a sales commission or incentive plan is illusory, and hence not enforceable, if it vests complete discretion in the employer whether commissions will be paid or not.  <u>Metz v. American Elec. Power Co., Inc.</u>, 877 N.E.2d 316, 326-27 (Ohio Ct. App. 2007).  The Court, however, need not decide whether ConMed's commissions plan for territory managers is illusory because Plaintiff has not contradicted ConMed's showing that he was paid all of the commissions he was entitled to receive.  Indeed, as discussed earlier, Plaintiff basically could not articulate any specific sales on which he thinks ConMed wrongfully withheld sales commissions.

Accordingly, ConMed's motion for summary judgment on Plaintiff's unjust enrichment claim is well-taken and is **GRANTED.**

<u>Conclusion</u>

For all of the reasons stated herein, ConMed is entitled to summary judgment on each of Plaintiff's claims.  ConMed's motion for summary judgment, therefore, is well-

25

taken and is **GRANTED**.  The complaint is **DISMISSED WITH PREJUDICE.  THIS CASE IS CLOSED.**

                       **IT IS SO ORDERED**

Date June 30, 2014                       s/Sandra S. Beckwith
                                     Sandra S. Beckwith
                         Senior United States District Judge